**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**VALDOSTA DIVISION**

| | |
|---|---|
| **MARTHA F. OWENS, Individually, and as the Executrix of the Estate of Andrew T. Fuller; SUSAN ROCKETT; DONALD ABNER POPE JR.; and REFUSE MATERIALS, INC.,**<br><br>Plaintiffs,<br><br>v.<br><br>**STIFEL, NICOLAUS & COMPANY, INC. and ANTHONY JOHN FISHER**,<br><br>Defendants. | Civil Action No. 7:12-CV-144 (HL) |

**ORDER**

This case is before the Court on Defendant Stifel, Nicolaus & Company, Inc.'s ("SNC") Motion for Summary Judgment as to Plaintiffs'[1] Negligence and Negligence Per Se Claims. (Doc. 62). Also before the Court is Plaintiffs Martha Owens' ("Owens") and Susan Rockett's ("Rockett") Motion for Partial Summary Judgment Regarding Defendant SNC's Counterclaim for Indemnification. (Doc. 66). After reviewing the pleadings, briefs, affidavits, depositions, and other evidentiary materials presented by both parties, the Court **GRANTS** Defendant's

---

[1] On June 5, 2014, the Court entered an order granting Defendant's motion for summary judgment (Doc. 58) as to all claims raised by Plaintiffs Donald Abner Pope and Refuse Materials, Inc. (Doc. 99). Accordingly, any reference to Plaintiffs at this point includes only Owens, both individually and as executrix of the Estate of Andrew T. Fuller, and Rockett.

motion for summary judgment on Plaintiffs' allegations of negligence *per se*. (Doc. 62). However, the Court finds that there are genuine disputes of material fact involving Plaintiffs' negligence claims. Accordingly, the Court **DENIES** Defendant's motion for summary judgment on Plaintiffs' negligence claims (Doc. 62). Because issues of fact remain regarding Plaintiffs' negligence claims, the Court must **DENY** Plaintiffs' motion for summary judgment on Defendant's counterclaim for indemnification. (Doc. 66).

## I.   FACTS

Defendant SNC is a securities broker-dealer firm. (Mazor Dep., p. 216-17). SNC employed Defendant Anthony John Fisher ("Fisher") from April 2009 until February 8, 2012. (DSOMF ¶ 1).[2] SNC ultimately terminated Fisher for violating company policy by engaging in private transactions outside the firm, or "selling away," and for forging documents. (Mazor Dep., p. 6, 27, 133).

Prior to hiring Fisher, Branch Manager Michael Mazor conducted a pre-hire investigation. (Mazor Dep., p. 115-116). As part of the hiring process, SNC's Compliance department completed a Compliance Interview on March 11, 2009, which included a review of Fisher's Compliance Registration Depository report ("CRD"). (DSOMF ¶¶ 3-4; Mazor Dep., p. 116; Doc. 64-4). Neither Mazor nor any other SNC employee contacted any of Fisher's past employers. (Mazor Dep.,

---

[2] "DSOMF" refers to Defendant's Statement of Material Facts. "PSOMF" refers to Plaintiffs' Statement of Material Facts. The cited paragraphs are those admitted by each party.

p. 117). In his deposition Mazor testified that he relied "upon the CRD information and our interviews, and there was nothing disclosed about Anthony Fisher prior to us terminating him. So when he was at Morgan Stanley possibly doing these private placements, it was not disclosed on his CRD at the time." (Mazor Dep., p. 117, 229). It is unclear from the record whether SNC performed a criminal background check on Fisher. However, Mazor admitted that SNC did not learn about Fisher's arrest history until after his termination. (Mazor Dep., p. 15).

Owens and Rockett first began working together as teachers over 42 years ago. (PSOMF ¶¶ 1, 3; Rockett Dep., p. 18). For the past 14 years, Rockett has served as Owens' personal assistant. (PSOFM ¶ 4). She is on call to Owens 24 hours a day, seven days a week. (Rockett Dep., p. 16). Rockett helps Owens manage both her personal affairs and the affairs of the estate of Owens' late father, Andrew T. Fuller. (Doc. 80-17). Following a period of hospitalization for severe depression, Owens signed a General Durable Power of Attorney on March 11, 2010, appointing Rockett as her agent so that Rockett could continue to transact business for her. (Doc. 37-2; Roberts Dep., p. 29-31).

Plaintiffs began investing with Fisher in approximately 2000 when Fisher was employed at Raymond James & Associates, Inc. (PSOFM ¶ 6; Roberts Dep., p. 33-34). Plaintiffs followed Fisher from Raymond James to Morgan Stanley. (Roberts Dep., p. 34). Then, when Fisher left Morgan Stanley and became employed at SNC in April 2009, Plaintiffs transferred their investment

3

accounts from to SNC. (PSOMF ¶ 7; Doc. 80-1). Owens opened two accounts with SNC on May 8, 2009, one for herself individually and one for the Estate of Andrew T. Fuller ("the Estate"), for which she served as Executrix. (Doc. 80-17). Owens transferred all of her Morgan Stanley holdings to SNC, including 110,000 shares of Cardiac Network, Inc. ("CNI") stock. (Docs. 80-1; 80-13). CNI is a medical technology company involved in the development of a new cardiac monitoring device. (Docs. 60-4; 68-4). Owens' account statements show significant losses in CNI investments prior to Owens moving her accounts from Morgan Stanley to SNC. (Docs. 80-1; 80-6).

On January 29, 2010, Owens executed a Convertible Loan Agreement with CNI. (Doc. 80-7). By the terms of the agreement, Owens transferred $200,000 to CNI in exchange for the return of the principal plus 12% interest or, in the alternative, shares in common stock equal to the outstanding principal plus any unpaid interest. (Doc. 80-7). Owens later exercised the option to convert the investment to common stock. (Docs. 80-8; 80-23). On July 22, 2011, she received 522,000 shares. Owens entered into a similar agreement on July 14, 2010 for $6,000. (Doc. 80-9). She likewise converted that investment into 32,923 shares on July 22, 2011. (Doc. 80-9).

Todd Newstead, a surveillance manager in SNC's Compliance division, sent an e-mail to Allen Brautigam, an executive with SNC, on July 20, 2010, alerting Brautigam to two brokers Newstead believed warranted review. (Doc. 68-

4

4). One of those brokers was Fisher. The surveillance department initiated a review of Fisher on July 14, 2010, based on unusual activity in both of Owens' accounts. There was some concern about the return of assets on these two accounts, or evidence that Fisher was receiving a high percentage of his commissions from these accounts. (Doc. 68-4; Newstead Dep., p. 35-36). The report further expresses concern about $310,000 wired out of the Owens account to CNI. Compliance contacted Mazor on July 15, 2010, to inquire about Fisher and CNI. (Doc. 68-4). When Mazor questioned Fisher about the compliance inquiry, Fisher responded with an explanation that Owens "owns shares in the open market that have been bought over the last 3 years. . . . She is not an officer of the company nor does she have any personal relationship with the company." (Doc. 75-23). Fisher informed Mazor that Owens brought CNI to him and that Fisher did not solicit the investment. (Mazor Dep. 118, 182, 184, 210). Mazor later confirmed with Compliance that he was aware of the activity in both of Owens' accounts and stated that he was comfortable with Fisher. (Doc. 68-4).

Owens made many additional transfers from her SNC account to an account held by Blade and Blade PA Trust Account, which was associated with CNI: March 17, 2011, $205,000; March 30, 2011, $105,000; April 14, 2011, $220,000; April 27, 2011, $250,000; May 9, 2011, $132,000; May 17, 2011, $118,000. (Doc. 80-11). These transfers total $1,030,000, and correspond with a March 17, 2011 Escrow Agreement between Owens, a company called Pacific

5

Coast Innovations ("PCI"), which was developing the technology behind CNI's heart monitor, and Blade & Blade, P.A., the Escrow Agent. (Doc. 80-21). The agreement states that the funds "will either be paid to PCI for the development of the heart monitor or paid to CNI for the conversion of a note." (Doc. 80-21). Fisher facilitated all of these transfers. (Rockett Dep., p. 36, 47, 54, 74).

The Transfer of Funds/Transfer of Securities authorization form Owens, and later Rockett, signed to effectuate each wire transfer contained the following indemnification provision:

> The undersigned hereby agrees to indemnify Stifel, Nicolaus & Company, Incorporated, and its parent, subsidiaries and affiliates and their respective past and present officers, directors, employees and agents against any and all loss, liability, claim, damage or expense (including without limitation, judgments, amounts paid in settlement and attorney's fees) arising out of or relating to the transfer or disbursement of cash/securities described herein.

(Doc. 80-11). After every transfer, Owens received a Disbursement Notification verifying the transfer. (Doc. 80-11). Mazor also followed up with a telephone call to verify that Owens intended to make the transaction. (Mazor Dep., p. 102-103, 153; Doc. 80-13).

Then, in May 2011, Fisher completed a referral form recommending CNI to SNC. (Honovich Dep., p. 20). The referral form makes no reference to Fisher's relationship with CNI and does not mention Owens or any other client's prior investment in the company. (Mazor Dep., p. 118, 185). That request then went to John Honovich, a managing director and investment banking liaison with SNC.

(Honovich Dep., p. 9). Honovich and his colleague Lauren Harrington conducted a telephone conference on May 11, 2011 with Brian Calhoun and Judy Crowhurst of CNI to learn more about the company and to determine whether SNC would be interested in assisting CNI in attracting additional investment capital. (Honovich Dep., p. 11-12). At the conclusion of the thirty minute conversation, SNC declined to invest any further resources in promoting CNI. (Honovich Dep., p. 41-43). SNC did not move forward in conducting due diligence because the company decided to turn down the opportunity and not to sell any CNI stock. (Honovich Dep., p. 70-72).

Even after SNC made clear that the brokerage firm would not be conducting further business with CNI, Fisher continued to assist Owens and Rockett in making additional investments in CNI. On July 28, 2011, Rockett authorized the wiring of $10,000 from her SNC account to a Bank of America account held by the Law Office of Brandon S. Chabner/Attorney Client Trust Account. (Doc. 80-11). A total of $215,000 was transferred out of the Estate account to the same Bank of America Trust Account: July 28, 2011, $90,000; September 20, 2011, $35,000; September 28, 2011, $45,000; October 6, 2011, $45,000. (Doc. 80-11). Again, after each transaction, Plaintiffs received written notification of the disbursement. (Doc. 80-11).  Mazor also verbally verified the transfers. (Mazor Dep., p. 13, 102-103). Typically, Fisher called Plaintiffs before

7

Mazor called to forewarn them that Mazor would be contacting them and then would call back after Mazor spoke with Plaintiffs. (Rockett Aff. ¶ 3(a)).

On January 31, 2012, Alfred Phillips, another SNC customer and a client of Fisher's, filed a complaint with Mazor. (Doc. 64-2; Mazor Dep., p. 126). Phillips contacted Mazor after receiving an account activity letter and questioned a $150,000 investment from July 2011. (Id.) Phillips was unaware that Fisher invested those funds in CNI; he knew only that Fisher "asked me for the money and he was going to pay it back in six months and he was going to give me 10 percent interest, I guess is the word, and I thought it was the most fantastic deal in the world." (Phillips Dep., p. 23-24).

Phillips' complaint sparked a full investigation into Fisher's trade activity, including discovery of multiple other SNC clients who worked with Fisher and invested in CNI. (Doc. 75-20). Upon entering Fisher's office, Mazor located hundreds of pages of documents relating to CNI and Fisher's involvement with CNI, some within plain view on Fisher's desk. (Doc. 64-2; Mazor Dep., p. 179-80). SNC additionally identified hundreds of e-mails Fisher filtered through his SNC account dealing with CNI. (Mazor Dep., p. 19, 38-39). According to Mazor, "[t]here were documents and notes regarding Cardiac Networks. Just documents that a broker should not be in possession of." (Mazor Dep., p. 179). Mazor boxed up the documents and sent them to SNC's legal department. (Id.) Among the documents Mazor unearthed was a document associated with Owens' account

that SNC later determined was forged or in some way altered. (Doc. 64-2; Mazor Dep., p. 133). Mazor never contacted Owens about the forgery. (Id.)

SNC conducted a telephone conference with Fisher on February 7, 2012. (Doc. 64-2). Fisher admitted to altering information on a client form and failing to disclose outside business activities. (Id.) SNC terminated Fisher on February 8, 2012, for "violation of firm policies, including failing to disclose outside business activities, selling away, and altering information on a form signed by a client." (Id.)

Plaintiffs filed their First Amended Complaint on August 8, 2013, alleging Defendant SNC is liable for damages resulting from fraud and misrepresentation of the investment potential in CNI and negligent or negligent *per se* in the hiring and supervision of Defendant Fisher. (Doc. 27). SNC moves for summary judgment in its favor on the negligence and negligence *per se* claims asserted by these Plaintiffs. (Doc. 62). Plaintiffs move for summary judgment on SNC's counterclaim for indemnification. (Doc. 66).

## II.   SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56 requires that summary judgment be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). "The moving party bears 'the initial responsibility of informing the . . . court

of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.'" Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1259 (11th Cir. 2004) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548 (1986) (internal quotations omitted)). Where the moving party makes such a showing, the burden shifts to the non-movant, who must go beyond the pleadings and present affirmative evidence demonstrating that a genuine issue of material fact does exist. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257, 106 S.Ct. 2505 (1986).

The applicable substantive law identifies which facts are material. Id. at 248. A fact is not material if a dispute over that fact will not affect the outcome of the suit under the governing law. Id. An issue is genuine when a reasonable jury could return a verdict for the non-moving party based on the evidence presented. Id. at 249–50.

When resolving a motion for summary judgment, the court must view all evidence and draw all reasonable inferences in the light most favorable to the non-moving party. Patton v. Trial Guar. Ins. Corp., 277 F.3d 1294, 1296 (11th Cir. 2002). The court is bound only to draw those inferences which are reasonable. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Allen v.

Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348 (1986)). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50 (internal citations omitted).

### III.   ANALYSIS

#### A.   Negligence *Per Se*

A claim for negligence *per se* arises where a plaintiff can demonstrate violations of federal or state statutes and where "(1) that plaintiff falls within the class of persons the statute was intended to protect; (2) the harm complained of was the same harm the statute was intended to guard against; and (3) the violation of the statute proximately caused the plaintiff's injury." Walton v. UCC X, Inc., 282 Ga. App. 847, 847-48 (2006) (citing McLain v. Mariner Health Care, 279 Ga. App. 410, 411 (2006)). Plaintiffs here point to no state or federal statutes or regulations under which they claim protection. Rather, Plaintiffs allege Defendant is negligent *per se* based on violations of industry regulations propounded by the Financial Industry Regulatory Authority ("FINRA"), including:

a.   FINRA Rules 3030, 3270, and other associated rules regarding outside business activities of a broker;

b.   FINRA Rule 3010 and other associated rules regarding a firm's supervisory responsibilities;

c.    FINRA Rules 2310, 2111, and other associated rules regarding investment suitability for individual clients.

(Doc. 27). Neither FINRA rules nor any internal policies maintained by Defendant rise to the level of law or public policy. Thompson McKinnon Sec., Inc. v. Clark, 901 F.2d 1668, 1571 (11th Cir. 1990).

FINRA is a Self-Regulatory Organization ("SRO") authorized by the Securities Exchange Act of 1934, as amended by the Maloney Act of 1938, to establish and enforce standards of conduct of broker/dealers and their registered representatives. 15 U.S.C. §§ 78f, 78o-3. As an SRO, FINRA is subject to oversight by the Securities Exchange Commission ("SEC"). Id.

There are several different mechanisms by which a violation of FINRA rules may be investigated. First, the Department of Enforcement or the Department of Market Regulation may request authorization of the Office of Disciplinary Affairs to issue a complaint. FINRA Rule 9211(a)(1). The FINRA Regulation Board additionally may direct the Office of Disciplinary Affairs to authorize the issuance of a complaint. FINRA Rule 9211(a)(2). Where FINRA is either unwilling or unable to act, the SEC is authorized to bring an action to enforce the exchange rules. 15 U.S.C. §§ 78u(f), 78s(d). These particular rules may only be enforced by the SRO or the SEC; there is no private right of action arising out of a rule violation. Thompson v. Smith, Barney, Harris Upham & Co., Inc., 709 F.2d 1413, 1419 (11th Cir. 1983) (holding that there is no private cause

of action under federal securities laws for violations of exchange rules); see also Knight v. E.F. Hutton and Co., Inc., 750 F.Supp. 1109, 1113 (M.D. Fla. 1990); Greene v. Loeb Partners, et al., 532 F.Supp. 747, 749 (S.D. Fla. 1982). The purpose of these types of rules is to standardize the expectation of professionalism within the industry not to protect the investor-public. See Cort v. Ash, 422 U.S. 66 (1975).

Plaintiffs found their negligence *per se* claims solely on FINRA rules. Since FINRA rules do not equate to law or public policy, and since no private cause of action exists for these plaintiffs to proceed with an action based on FINRA rules alone, Plaintiffs' negligence *per se* claims must fail as a matter of law.

**B.    Negligence**

Defendant next challenges Plaintiffs' negligence claims. Plaintiffs allege Defendant was negligent in hiring Fisher and subsequently breached its duty to supervise, train, and monitor its agents, including but not limited to Fisher. (Doc. 27). Plaintiffs claim that Defendant's failure to exercise reasonable care, therefore, was the proximate cause of Plaintiffs' injuries and damages. (Doc. 27). Defendant contends that Plaintiffs base these claims on FINRA rules alone; therefore, the court should grant summary judgment in its favor because there is no private cause of action for alleged violations of FINRA regulations. The Court disagrees and finds that Plaintiffs negligence claims rely at least in part on state

common law. Viewing the facts in favor of Plaintiffs, the Court concludes that the evidence is sufficient to create a jury question for Plaintiffs' negligence claims.

### 1.    Negligent Hiring and Retention

Under Georgia law, an employer "is bound to exercise ordinary care in the selection of employees and not to retain them after knowledge of incompetency." O.C.G.A. § 34-7-20. An employer additionally owes a "duty to exercise ordinary care not to hire or retain an employee the employer knew or should have known posed risk of harm to others where it is reasonably foreseeable from the employee's 'tendencies' or propensities that the employee could cause the type of harm sustained by the plaintiff." Munroe v. Universal Health Servs., Inc., 277 Ga. 861, 863 (2004). "Whether or not an employer's investigative efforts were sufficient to fulfill its duty of ordinary care is dependent upon the unique facts of each case." Id. at 864, n. 4. As a result, summary judgment is only appropriate where the evidence of negligent hiring and supervision is "plain, palpable and undisputable." Id. at 866.

While the record here does contain evidence that SNC conducted a pre-hire investigation of Fisher, the parties dispute the sufficiency of the investigation. SNC's policy manual provides that SNC "will conduct a background investigation for all new employees." (Doc. 75-6). Prior to making an offer of employment, SNC is not only to review the applicant's CRD but also contact the applicant's

employer's for at least the previous three years. (Id.) SNC policy further requires fingerprinting and a thorough criminal background check. (Id.)

Plaintiffs' expert witness Gregory B. Wood points to a number of pre-hire "red flags" that should have altered SNC to potential issues with Fisher. (Doc. 50-3). Among those alerts is the assertion that Fisher was underfinanced and that he did not have managed money, meaning that he was prone to trading accounts aggressively; that his production level and business mix was below industry norms; and that he worked for eight employers within a fifteen year period. Id. Fisher's 2010 Broker Review highlights the consequences of Fisher's financial woes. (Doc. 75-14). The report reveals that Fisher was deriving 90% of his commissions from Owens' two accounts alone. Id. SNC Branch Manager Mazor further admitted that he did not contact Morgan Stanley, Fisher's last employer before joining SNC. (Mazor Dep., p. 117). Contacting Morgan Stanley would have revealed that Fisher owed his former employer more than $30,000, and that the investment firm had to sue Fisher to recoup the money. (Doc. 75-5).

The evidence presented is not so indisputable that the Court can determine as a matter of law that SNC was not negligent in hiring Fisher. Whether or not SNC met their duty to exercise ordinary care in carrying out their investigative duty, and whether or not additional investigative efforts would have revealed information about Fisher and his propensities as a broker such that

15

SNC should have been more on guard in preventing the harm alleged in this case are all questions that must go to a jury.

### 2.    Negligent Supervision

A cause of action for negligence arises where there is "(a) a legal duty to conform to a standard of conduct raised by the law for the protection of others against unreasonable risks of harm; (2) breach of this standard; (3) a causal connection between the conduct and the injury; and (4) damages from the breach of duty." Weller v. Blake, 315 Ga. App. 214, 219 (2012) (internal citations and emphasis omitted). While the law does not support a holding that violation of FINRA rules or SNC's internal policies constitutes negligence *per se*, "[p]rivately established 'rules are admissible as illustrative of negligence.'" Luckie v. Piggly-Wiggly Southern, Inc., 173 Ga. App. 177, 178 (1984). And, even though the FINRA rules do not provide a private cause of action, failure to comply with the rules may provide evidence of a breach of the duty of care, "which includes a duty to act in accordance with the standard of care used by other professionals in the community." Remington v. Newbridge Sec. Corp., 2013 U.S. Dist. LEXIS 79082, at *18-19 (S.D. Fla. June 5, 2013) (citing Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Cheng, 697 F. Supp. 1224, 1228 (D.D.C. 1988); see also Javitch v. First Montauk Fin. Corp., 279 F. Supp. 2d 279, 938 (N.D. Ohio 2003) (NASD and NYSE rules reflect the industry standard); Lange v. H. Hentz & Co., 418 F. Supp.

1376, 1384 (N.D. Tex. 1976) (holding that NASD Rules may provide a foundation for the standard of care in the industry).

Plaintiffs here set out a negligence argument similar to that argued by the plaintiffs in <u>Remington</u>. 2013 U.S. Dist. LEXIS at * 16. There, the plaintiffs claimed that the defendant broker-dealer negligently breached the standard of care owed to the plaintiffs by charging excessive fees in violation of FINRA Rule 2430. <u>Id</u>. The defendants moved the court to dismiss the negligence claims on the premise that FINRA rules do not create a private cause of action. <u>Id</u>. at *17. The court denied the motion, holding that "[w]hile there might not be a private right of action for violation of Rule 2430, Plaintiffs are not suing merely for violation of Rule 2430. Rather, they allege that Newbridge's failure to comply with the rule is evidence that they breached their duty of care, which includes a duty to act in accordance with the standard of care used by other professionals in the community." <u>Id</u>. at *18-19.

The same is true in this case. Plaintiffs argue that Defendants violated FINRA Rules by failing to monitor Fisher's activities properly. The question thus presented in the context of the negligence claim is not whether Plaintiffs have the right to recover based solely on the alleged violations of the specified FINRA rules and SNC's own policy manual but whether Defendant's breached the standard of care according to industry regulations for supervising employees. Georgia common law recognizes a cause of action for negligent supervision

where there is evidence of a policy violation and "'where there is sufficient evidence to establish that the employer reasonably knew or should have known of an employee's tendencies to engage in certain behavior relevant to the injuries allegedly incurred by the plaintiff.'" Leo v. Waffle House, Inc., 298 Ga. App. 838, 841 (2009).

FINRA rules require member brokerage firms to develop written policies and procedures for supervising employees. FINRA Rule 3110. The supervisory system must be "reasonably designed to achieve compliance with applicable securities laws and regulations, and with applicable FINRA rules." Id. SNC created a policy manual that conforms to this requirement. (Doc. 75-9 – 75-13). Plaintiffs point to a number of SNC policies that they allege SNC failed to administer effectively and lead to the harm alleged.

The Branch Manager serves as "the first line of supervision in the branch office." (Doc. 75-12, p. 626). In this supervisory capacity, the Branch Manager is responsible for reviewing account activity and sales practices. (Id.) These reviews include examining all client correspondence and daily monitoring of e-mails from branch associates that are flagged and placed in the review queue. (Id.) Additionally, management must regularly review SNC employee investment accounts, including outside investment accounts, which are approved on an exception only basis. (Doc. 75-13, p. 634). The policy manual sets out a non-exhaustive list of suggested factors or alerts for branch managers to consider

18

when reviewing employee accounts, including, for example: ensuring that the size of the transaction is consistent with income and financial situation; looking for instances where an employee and a client are buying/selling the same security; noting the number of transactions; alerting to sudden changes in trading patterns; examining consistent wire transactions to the same outside party, which "could be an indication that the employee is involved in a private placement deal, outside activity, has outside accounts or is co-mingling funds." (Doc. 75-13, p. 635-36).

The Compliance Office, likewise, plays a role in monitoring broker activity. SNC policy charges that department with the task of conducting annual announced and unannounced office inspections. (Doc. 75-9, p. 124-25). Inspections "must be conducted by someone independent of supervisors of the office being inspected. (Doc. 75-9, p. 125). The compliance department also is responsible for setting policy and conducting surveillance of employee internet and e-mail activity. (Newstead Dep., p. 13). That system is designed to flag unusual trade activity or to alert to certain words and phrases within text and then to pass that information along to a branch manager for further review. (Newstead Dep., p. 17-20).

Plaintiffs allege that SNC failed to conform to the prescribed standard of conduct for supervising Fisher. As a result, Plaintiffs were harmed and suffered significant financial losses. According to Plaintiffs, had SNC followed its own

19

procedures for evaluating e-mails and inspecting offices, SNC would have discovered the full extent of Fisher's dealings with CNI. More careful analysis not only of Plaintiffs' account but also other customer accounts also would have revealed Fisher's practice of selling away and prevented further loss. Defendants do not address these specific allegations: "Stifel did not move for summary judgment on Plaintiffs' negligence claims on the basis that Mazor, or Stifel generally for that matter, was not negligent in their supervision of Fisher. Rather, Stifel moved for summary judgment because there is no basis in the law for Plaintiffs' claims." (Doc. 91). That simply is not the case. Plaintiffs' negligent supervision claims are well founded in common law. The Court accordingly finds that the question of whether or not SNC breached their duty to abide by the supervisory guidelines promulgated by both FINRA and their own policy manual is a question of fact to be resolved by a jury.

### C.   Indemnification

When authorizing transfers of funds from an SNC account, SNC clients, including Plaintiffs, sign a Transfer of Funds/Transfer of Securities authorization form ("the Form") that contains the following indemnification provision ("Indemnification Provision"):

> The undersigned hereby agrees to indemnify Stifel, Nicolaus & Company, Incorporated, and its parent, subsidiaries and affiliates and their respective past and present officers, directors, employees and agents against any and all loss, liability, claim, damage or expense (including without limitation, judgments, amounts paid in settlement and attorney's fees) arising out of or relating to the transfer or disbursement of cash/securities described herein.

(Doc. 80-11).

The parties disagree about the scope of the Indemnification Provision. SNC filed a counterclaim against Plaintiffs on the premise that each time Plaintiffs transferred funds from their SNC account to a CNI account, Plaintiffs indemnified SNC for any loss incurred as a result of the transfer under any circumstances and are liable to SNC for its losses, expenses, and attorneys' fees arising from the present litigation. (Doc. 29). Plaintiffs admit to signing the Form but deny agreeing to indemnify SNC for its own negligence and fraud. (Doc. 33). Plaintiffs now move for summary judgment on SNC's counterclaim, asserting that the Indemnification Provision is limited to errors "arising out of or relating to" transfers and arguing that they never agreed to compensate SNC for its negligent or fraudulent acts. (Doc. 66).

In the absence of express contractual language, public policy does not support "cast[ing] the burden of negligent actions upon those who are not actually at fault." Allstate Ins. Co. v. Atlanta, 202 Ga. App. 692, 693 (1992). Accordingly, "Georgia courts never imply an agreement to indemnify another for one's own negligence in the absence of express language." Id. The words of the

indemnification provision like any other disputed contractual term "must be construed strictly against the indemnitee." <u>Park Pride of Atlanta v. City of Atlanta</u>, 246 Ga. App. 689, 691 (2000). Every presumption is against finding an intention to indemnify a negligent party. <u>Id</u>.

The Indemnification Provision here states simply that "the undersigned hereby agrees to indemnify [SNC] . . . against any and all loss." The clause contains no express statement about coverage of SNC's negligent acts. Plaintiffs are suing SNC based on a loss incurred as a result of SNC's alleged negligence. To the extent that the Provision fails to "expressly, plainly, clearly, and unequivocally state" that Plaintiffs agreed to indemnify SNC from SNC's own negligence, Plaintiffs are not obligated to indemnify SNC for any loss SNC may incur should a jury ultimately determine that SNC was negligent. <u>Id</u>. However, the Court is unable to find as a matter of law that SNC acted negligently in hiring and supervising Fisher. Accordingly, the Court must deny Plaintiffs' motion.

## IV.   CONCLUSION

For the reasons discussed above, Defendant's Motion for Summary Judgment as to Plaintiffs' Negligence and Negligence Per Se Claims (Doc. 62) is granted in part and denied in part. Plaintiffs' Motion for Summary Partial Summary Judgment Regarding Defendant's Counterclaim for Indemnification (Doc. 66) is denied.

22

**SO ORDERED** this 18th day of June, 2014.


*s/ Hugh Lawson*_____
**HUGH LAWSON, SENIOR JUDGE**


aks